UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America, | No. 2:15-CR-00118-KJM |
| Plaintiff, | |
| v. | ORDER |
| Michael Deshone Mathews, | |
| Defendant. | |

Michael Deshone Mathews moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i), citing his increased risk of severe illness from the virus even though he has been vaccinated against the virus that causes COVID-19, SARS-CoV-2. The government opposes on numerous grounds, including Mr. Mathews' prior recovery from COVID-19 and his disciplinary history. For the following reasons, the court **grants** the motion.

**I.     BACKGROUND**

In May 2014, DEA agents uncovered information suggesting Mr. Mathews was shipping oxycodone from the Sacramento area to Tacoma Washington. Factual Basis for Plea, Plea Agreement Ex. A, ECF No. 60. Agents later observed him retrieving oxycodone from people who had just filled prescriptions at local pharmacies and distributing the oxycodone to couriers who shipped the drugs across Washington state. *Id.* Searches of his truck, house and storage unit

/////

1

1   uncovered numerous controlled substances, dozens of guns, thousands of rounds of ammunition,
2   and body armor.  *Id.*

3         The government charged Mr. Mathews with several drug distribution and possession,
4   money laundering, and firearms crimes.  *See* Indictment at 1–5, ECF No. 15.  He pleaded guilty
5   to participating in a conspiracy to possess and distribute oxycodone and to possessing heroin with
6   an intent to distribute it.  Hr'g Min., ECF No. 57; 21 U.S.C. §§ 846, 841(a)(1).  Another judge of
7   this court sentenced him to 135 months' imprisonment and 60 months' supervised release, below
8   the applicable guideline range.  J. & Commitment, ECF No. 86.  After sentencing, the
9   government dismissed the remaining charges in the indictment.  Hr'g Min., ECF No. 83.  Mr.
10  Mathews is also serving a subsequent consecutive four-month sentence for escape.  He left the
11  low-security Yankton Federal Prison Camp for about ten minutes and returned with contraband
12  tobacco, a cellphone, and alcohol in December 2019.[1]  *See generally* Factual Basis Statement,
13  *United States v. Mathews*, No. 20-40029 (D.S.D. Mar. 20, 2020), ECF No. 20;[2] Sentencing Hr'g
14  Tr., *United States v. Mathews*, No. 20-40029 (D.S.D. June 16, 2020).[3]

15        Mr. Mathews is currently serving his sentences at FCI Sandstone in Sandstone,
16  Minnesota.  Opp'n at 3; Reply at 4, ECF No. 188.  As of the date of this order, FCI Sandstone has
17  vaccinated 117 staff members and 617 incarcerated people.  U.S. Bureau of Prisons (BOP),
18  *COVID-19 Vaccine Implementation* (last visited Aug. 9, 2021).[4]  The BOP website does not make
19  clear whether the vaccines administered are to people still housed in the prison, but if so 617
20  represents approximately 75 percent of the total 819 people incarcerated at FCI Sandstone.  BOP,
21  *FCI Sandstone* (last visited Aug. 19, 2021).[5]  One staff member at FCI Sandstone recently tested
22  positive, but no inmates have.  BOP, *Covid-19 Cases* (last visited August 19, 2021).[6]  Since the

---

[1] The court is aware of no authority that precludes its exercising jurisdiction in deciding this motion for compassionate release, notwithstanding the role played by the court in the District of South Dakota.

[2] This statement was docketed in this case at ECF No. 188-4.

[3] This transcript was docketed in this case at ECF No. 188-5.

[4] https://www.bop.gov/coronavirus/

[5] https://www.bop.gov/locations/institutions/sst/index.jsp

[6] https://www.bop.gov/coronavirus/

1   beginning of the COVID-19 pandemic, 659 people (617[7] incarcerated people and 53 staff

2   members) at FCI Sandstone have recovered from COVID-19, and one incarcerated person has

3   died of causes related to COVID-19 in January 2021.  *Id.*

4       Mr. Mathews has served approximately 53 percent of his 139-month combined sentence,

5   and just shy of 60 percent of his statutory term.  *See* U.S. Bureau of Prisons Public Information

6   Data at 4, Opp'n Ex. 1, ECF No. 177-1.  Since he entered prison, he has participated in many

7   programs; most recently he completed a twelve-month welding program.  Mathews Decl. ¶ 8,

8   Reply Ex. A, ECF No. 188-1; *see also* Sentencing Hr'g Tr. *supra* at 12:3–23 (Mr. Mathews had

9   participated in a plumbing apprenticeship at Yankton Federal Prison Camp and had enrolled in

10  college courses).  Mr. Mathews has also prepared to work as a plumber, welder, forklift driver,

11  tile setter, and construction worker.  Release Plan at 2, Reply Ex. G, ECF No. 188-7.

12      Mr. Mathews' medical records show he is a 47-year-old Black man with a body mass

13  index (BMI) over 33, which means he is within the category the Centers for Disease Control and

14  Prevention have labeled "obese."  Abdelghany Decl. at 3, Reply Ex. B, ECF No. 188-2.  He also

15  suffers from multiple diagnosed substance use disorders, namely cannabis use disorder, opioid

16  use disorder, intranasal cocaine stimulant use disorder, and hallucinogen use disorder.  *Id.* at 4;

17  Medical Records at 54, ECF No. 196-1 (under seal).  He was diagnosed with asymptomatic

18  COVID-19 on December 22, 2020, and developed "mild, symptomatic COVID-19" on December

19  26, 2020.  Medical Records at 55, 59; Abdelghany Decl. at 5.

20      In January 2021, Mr. Mathews, representing himself, moved for compassionate release

21  under 18 U.S.C. § 3582(c)(1)(A)(i).  *See generally* Mot., ECF No. 172.  He cited his race, gender,

22  BMI and the conditions at FCI Sandstone as "extraordinary circumstances" justifying reduction

23  of his sentence.  *See generally id.*  At that time, he said he was not vaccinated.  Mot. at 2.  The

24  government opposed on several grounds, including that Mr. Mathews was at low risk of severe

25  COVID-19 because he had previously recovered from COVID-19 without symptoms.  *See* Opp'n

26  at 10, ECF No. 177.  This court then appointed counsel to represent Mr. Mathews, Min. Order

---

[7] The court notes this is an identical number to the number of incarcerated people who have received a vaccination, and assumes this is a coincidence.

(April 1, 2021), ECF No. 182, and counsel filed a reply on Mr. Mathews' behalf, *see generally* Reply, ECF No. 188. Mr. Mathews contested the government's claim that his COVID-19 infection had been asymptomatic, saying he had experienced several symptoms, and reporting he was still suffering from some of those symptoms months later, including shortness of breath, migraines, back pain, and a lack of mental focus and energy. *Id.* at 2; Mathews Decl. ¶ 3. His reply papers also included a declaration by Dr. Mazin Abdelghany, a physician with training in critical care and a Fellow of Infectious Diseases at the University of California, San Francisco. Abdelghany Decl. at 1. In Dr. Abdelghany's assessment, Mr. Mathews "has several medical comorbidities . . . strongly associated with an increased risk of developing severe COVID-19 disease, including hospitalization, admission to the intensive care unit, need for invasive medical ventilation (respiratory life support), and death." *Id.* at 9.

In July, given BOP's progress in vaccinating inmates, this court directed the parties to provide an update on Mr. Matthews' vaccine status. Order (June 23, 2021), ECF No. 197. Following the court's order, the government confirmed Mr. Mathews had been "fully vaccinated" by that time, Gov't Resp. at 1, and the defense submitted a supplemental brief and declaration by Dr. Abdelghany, *see* Suppl. Br., ECF No. 199; Suppl. Abdelghany Decl., ECF No. 199-1. The doctor assumed Mr. Mathews was fully vaccinated and assessed whether he nonetheless remained at an increased risk of severe COVID-19. *See* Suppl. Abdelghany Decl. at 1. In Dr. Abdelghany's opinion, Mr. Mathews "continues to have an increased risk of SARS-CoV-2 infection" because (1) "[a]nalyses of vaccine efficacy outside of trial environments have noted a protection rate of about 90%" and (2) "SARS-Cov-2 variants have the potential to evade immunity induced by vaccines—especially the alpha variant circulating in Minnesota," where Mr. Mathews is currently incarcerated. *Id.* ¶ 12. The government did not request leave to file any further response, and it did not object to Dr. Abdelghany's supplemental declaration.

## II.   LEGAL STANDARD

The district court that imposed a custodial sentence can modify the term of imprisonment under 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act of 2018. The defendant must first exhaust administrative remedies. *Id.* §§ 3582(c)(1)(A). If a defendant has exhausted

administrative remedies, the analysis is twofold. First, the court must find "extraordinary and compelling reasons warrant" the requested reduction. *Id.* § 3582(c)(1)(A)(i). Second, the court must consider the same factors that were applicable at the original sentencing, enumerated in 18 U.S.C. § 3553(a), to the extent they remain applicable. *See id.* § 3582(c)(1)(A).

Section 3582 further requires a reduction to be "consistent with applicable policy statements issued by the Sentencing Commission." *Id.* § 3582(c)(1)(A). In 2006, the Sentencing Commission issued a policy statement addressing what qualifies as "extraordinary and compelling reasons" to release a defendant from BOP custody. *See* U.S.S.G. § 1B1.13 (last amended November 1, 2018). These policy statements "may inform a district court's discretion for § 3582(c)(1)(A) motions filed by a defendant, but they are not binding." *United States v. Aruda,* 993 F.3d 797, 802 (9th Cir. Apr. 8, 2021). Thus, the court here adheres to its practice of considering the Sentencing Commission's policy statement as nonbinding guidance.

Although the Ninth Circuit has not expressly decided which party "bears the burden in the context of a motion for compassionate release brought pursuant to § 3582(c) as amended by the [First Step Act], district courts to have done so," including this court, "agree that the burden remains with the defendant." *United States v. Becerra*, No. 18-0080, 2021 WL 535432, at *3 (E.D. Cal. Feb. 12, 2021).

### III.  ANALYSIS

The parties do not dispute that Mr. Mathews has exhausted his administrative remedies as required by § 3582(c). Opp'n at 3. The court thus considers (A) whether Mr. Mathews' request is supported by extraordinary and compelling reasons and (B) whether the applicable sentencing factors of § 3553(a) weigh in favor of a reduction.

#### A.     **Extraordinary & Compelling Reasons**

Many federal district courts, including this court, have held that defendants can demonstrate "extraordinary and compelling reasons" for compassionate release under § 3582(c)(1)(A)(i) if they show (1) their health conditions put them at an increased risk of severe COVID-19 symptoms and (2) they are at risk of infection. Risk of infection can be shown by demonstrating the facility where they reside is currently suffering from a COVID-19 outbreak or

is at risk of an outbreak, for example, because it is a congregate living facility in which inmates and staff cannot consistently maintain safe physical distances. *See, e.g., United States v. Terraciano*, 492 F. Supp. 3d 1082, 1085–86 (E.D. Cal. 2020).

The court's calculus shifts, however, if a defendant is vaccinated against COVID-19. *United States v. Smith*, ___ F. Supp. 3d ___, No. 98-00009, 2021 WL 1890770, at *2–6 (E.D. Cal. May 11, 2021). If a defendant is vaccinated, as Mr. Mathews is here, this court has employed a rebuttable presumption that the risk of severe harm from COVID-19 is not an "extraordinary and compelling" reason under § 3582(c)(1)(A)(i). *Id.* at 5. A defendant can rebut this presumption by offering evidence of an elevated personal risk of severe harm despite the protections of vaccination. *Id.* at 5; *see also United States v. Peel*, No. 14-00192, 2021 WL 2875658, at *3 (E.D. Cal. July 8, 2021). Evidence of such an elevated personal risk might include judicially noticeable information published by public health authorities, expert opinions, and scientific studies. *See Smith,* 2021 WL 1890770 at *4.

Mr. Mathews has rebutted the presumption here by submitting Dr. Abdelghany's declarations. A few more details about Dr. Abdelghany's opinions are necessary to illuminate the court's reasoning. Dr. Abdelghany explains two scenarios in which people can be re-infected with COVID-19: (1) the loss of protective immunity after vaccination or (2) infection with a variant. Suppl. Abdelghany Decl. ¶ 6–7 (citing U.S. Ctrs. for Disease Control & Prevention, *US Covid-19 Cases Caused by Variants* (Apr. 10, 2021)[8] & U.S. Ctrs. for Disease Control & Prevention, *Tracking Variants* (August 12, 2021)).[9] These scenarios are not mutually exclusive; a person can both lose protective immunity and become infected with a variant. *See id.* ¶ 6.

As for the first scenario, loss of immunity after vaccination, Dr. Abdelghany explained that data is now available beyond that originally gathered in clinical trials. *See id.* ¶ 12. He cites two studies. *See id.* (citing Mark G. Thompson et al., *Prevention and Attenuation of Covid-19*

---

[8] https://www.cdc.gov/coronavirus/2019-ncov/transmission/variant-cases.html, currently redirects to U.S. Ctrs. For Disease Control & Prevention, *Variant Proportions* (last visited August 19, 2021), https://covid.cdc.gov/covid-data-tracker/#variant-proportions.

[9] https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/COVID-Variants.aspx.

6

*with the BNT162b2 and mRNA-1273 Vaccines*, 385 N. Engl. J. Med. 320 (2021)[10] and Colin Pawlowski, et al., *FDA-Authorized mRNA COVID-19 Vaccines are Effective per Real-World Evidence Synthesized Across a Multi-State Health System*, 2 Med (NY), electronic publication ahead of print) (June 29, 2021)).[11]

In both, the data cited in Dr. Abdelghany's supplemental declaration confirms vaccines are highly effective, but not perfect, protection against SARS-CoV-2 infections and severe COVID-19. Reported vaccination effectiveness rates are about 90 percent. Among the few vaccinated people who do become infected, the rates of severe COVID-19, as measured by hospitalizations, admissions to the intensive care unit, and death, are drastically reduced.

These results are similar to the clinical trial data this court relied on in its previous order, which showed (1) that vaccines were about 94 percent effective against infection and (2) that vaccinated people who became infected were much less likely to suffer from severe COVID-19. *Smith*, 2021 WL 1890770 at *3. The CDC's assessment is the same:

> Vaccine effectiveness studies provide a growing body of evidence that mRNA COVID-19 vaccines offer similar protection in real-world conditions as they have in clinical trial settings, reducing the risk of COVID-19, including severe illness, among people who are fully vaccinated by 90 percent or more. . . .
>
> . . .
>
> While COVID-19 vaccines are working well, some people who are fully vaccinated against COVID-19 will still get sick, because no vaccines are 100% effective. . . . mRNA COVID-19 vaccines have been shown to provide protection against severe illness and hospitalization among people of all ages eligible to receive them.

U.S. Ctrs. for Disease Control & Prevention, *COVID-19 Vaccines Work* (Aug. 16, 2021).[12] The court therefore cannot conclude that Mr. Mathews faces an increased personal risk of severe harm from COVID-19 solely due to the risk of reinfection.

---

[10] https://www.nejm.org/doi/full/10.1056/nejmoa2107058

[11] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8238652/

[12] https://www.cdc.gov/coronavirus/2019-ncov/vaccines/effectiveness/work.html, last visited Aug. 19, 2021.

7

However, the second risk scenario described in Dr. Abdelghany's declaration, the risk of severe disease associated with coronavirus variants, is more difficult to assess. When this court last considered this question, other district courts had acknowledged that new and more dangerous variants might emerge but had concluded that vaccines "protect against infections from new coronavirus variants." *Smith*, 2021 WL 1890770, at *4 (citing *United States v. Kariblghossian*, No. 13-00318, 2021 WL 1200181, at *3 (C.D. Cal. Mar. 29, 2021) and *United States v. Singh*, No. 15- 00028, 2021 WL 928740, at *3 (M.D. Pa. Mar. 11, 2021)). Many courts have reached the same conclusion in recent orders and have often denied motions for compassionate relief despite the risk of infection by SARS-CoV-2 variants.[13]

A minority has expressed greater concern. An example from this group is *United States v. Sherrod*, No. 19-20139, 2021 WL 3473236 (E.D. Mich. Aug. 6, 2021). The court recognized district courts have "often, but not always" denied motions under § 3582(c)(1)(A) when fully vaccinated defendants have argued they were at risk of severe COVID-19. *Id.* at *4. It noted that even those courts recognized the "calculus might change if there were a shift in scientific consensus" and many orders invited defendants to renew their motions if "more information emerged[d] suggesting that the . . . vaccines cannot protect [the defendant]." *Id.* (citing in part *United States v. White*, No. 15-cr-20040-01, 2021 U.S. Dist. LEXIS 47351, at *5 (E.D. Mich. Mar. 15, 2021)). The court then cited recent reports in the popular press that people had been infected with and spread "the so-called 'Delta' variant, despite being vaccinated" and data showing that many people in the same prison and surrounding community had not been vaccinated. *Id.* (citing data from the Bureau of Prisons, *The New York Times*, NPR, and CNBC). These reports and data were sufficiently concerning, and they added to the court's impression

---

[13] *See, e.g.*, *United States v. Johnson*, No. 16-0043, 2021 WL 3508818, at *3 n.10 (N.D. Ind. Aug. 10, 2021) ("[T]he CDC has stated that the COVID-19 vaccines are effective against severe disease and death from variants of the virus currently circulating in the United States, including the Delta variant."); *United States v. Sparks*, No. 13-00228, 2021 WL 3510229, at *3 (D. Or. Aug. 10, 2021) (denying compassionate release despite the risk of infection with the "Delta variant of the COVID-19 virus"); *United States v. Hormozi*, No. 15-00272, 2021 WL 3514807, at *6 (E.D. Cal. Aug. 10, 2021) (same); *see also United States v. Hernandez*, No. 10-20055, 2021 WL 3472646, at *2 (D. Kan. Aug. 6, 2021) (collecting recent authority and finding the risk of infection by variants was not "extraordinary and compelling reasons" for release).

"that the entirety of [the defendant's] time in BOP custody has been more punitive and less rehabilitative than the Court intended." *Id.*  Ultimately, the court in *Sherrod* found that the defendant had given "extraordinary and compelling reasons" under § 3582(c)(1)(A)(i). *Id.*; *see also United States v. Osorio-Perez*, No. 16-0826, 2021 WL 3473765, at *3 (S.D.N.Y. Aug. 6, 2021) (finding the risk of infection with a SARS-CoV-2 variant contributed to the defendant's broader circumstances, which in sum were "extraordinary and compelling reasons").

As the court wrote in *Sherrod*, however, "district judges are not epidemiologists." 2021 WL 3473236, at *5.  As this court has previously noted, "judges cannot evaluate the risks of severe disease to a particular person, vaccinated or not, without reliable evidence." *Smith*, 2021 WL 1890770, at *4.  Reports in the popular press are concerning, but they are rarely the work of subject matter experts.  News article summaries are not controlled, not subjected to statistical testing, and not peer reviewed.  The court therefore primarily turns to the "judicially noticeable information published by public health authorities" and expert opinions that can offer reliable evidence of medical risks in a particular case.  *See, e.g.*, *id.* at *3–4.

According to the CDC, new variants of the virus that causes COVID-19 are spreading in the United States and in other parts of the world.  U.S. Ctrs. Disease Control, *About Variants* (Aug. 6, 2021).[14]  Vaccines offer protections against most variants but "some fully vaccinated people will still be hospitalized and die." U.S. Ctrs. Disease Control, *Possibility of COVID-19 Illness After Vaccination* (Aug. 16, 2021).[15]  Dr. Abdelghany explains further in his declaration that variants "have been under intense investigation because of their potential for increased infectivity, to cause increased severity of disease, to escape monoclonal antibody treatments, and to evade and reduce the efficacy of current vaccines." Suppl. Abdelghany Decl. ¶ 7.  In Minnesota, where Mr. Mathews is incarcerated, the "alpha" variant is the most common, but the "beta" variant is also "spreading quickly." *Id.* ¶ 8.  Both the alpha and beta variants have a 50

/////

---

[14] https://www.cdc.gov/coronavirus/2019-ncov/variants/variant.html
[15] https://www.cdc.gov/coronavirus/2019-ncov/vaccines/effectiveness/why-measure-effectiveness/breakthrough-cases.html

9

1  percent increased risk of transmission.  *Id.*  The alpha variant also "likely" bears an "increased
2  risk of severe disease and death."  *Id.*

3  Studies about whether COVID-19 vaccines are effective in preventing these variants show
4  "variable results."  *Id.* ¶ 9.  When cases are "assessed by antibody (immune flag) binding to virus
5  particles," the results are "conflicting."  *Id.* ¶ 10.  Some tests show vaccines are effective against
6  the alpha variant, but others show a "small, but significant reduction in vaccine efficacy" for the
7  alpha variant.  *Id.* (citing Xiaoying Shen et al., *SARS-CoV-2 Variant B.1.1.7 is Susceptible to*
8  *Neutralizing Antibodies Elicited by Ancestral Spike Vaccines*, 29 Cell Host Microbe 529 (2021)[16]
9  and Zijun Wang et al., *mRNA Vaccine-Elicited Antibodies to SARS-CoV-2 and Circulating*
10  *Variants*, 592 Nature 616 (2021)).[17]  "The data are similar for the beta variant."  *Id.*  But "one
11  study showed strong evidence" that vaccines were less effective.  *Id.* (citing Wilfredo F. Garcia-
12  Beltran, *Multiple SARS-CoV-2 Variants Escape Neutralization by Vaccine-Induced Humoral*
13  *Immunity*, 184 Cell 2372 (2021)).[18]  Clinical case reports also describe patients who have
14  developed COVID-19 after vaccination, and one patient was infected with a variant closely
15  related to the alpha now circulating in Minnesota.  *Id.* ¶ 11 (citing Ezgi Hascisuleyman et al.,
16  *Vaccine Breakthrough Infections with SARS-CoV-2 Variants*, 384 N. Engl. J. Med. 2212
17  (2021)).[19]

18  Based on these studies, Dr. Abdelghany concludes Mr. Mathews remains at an "increased
19  risk of SARS-CoV-2 infection . . . , especially given his current incarceration in Minnesota where
20  the alpha variant—a virus with known ability to infect vaccinated patients—is the most common
21  cause of COVID-19 disease."  *Id.* ¶ 12.  Dr. Abdelghany uses cautious language in reaching that
22  conclusion.  He writes, for example, that variants "have the *potential* to evade immunity inducted
23  by vaccines" and an "*ability* to infect vaccinated patients."  *Id.* (emphases added).  Dr.
24  Abdelghany's statements align with the Minnesota Department of Health, which recently reported

---

[16] https://pubmed.ncbi.nlm.nih.gov/33705729/
[17] https://pubmed.ncbi.nlm.nih.gov/33567448/
[18] https://pubmed.ncbi.nlm.nih.gov/33743213/
[19] https://www.nejm.org/doi/full/10.1056/NEJMoa2105000

that of the 2,989,353 Minnesotans who were fully vaccinated, 7,171 reported vaccine breakthrough cases.  Minn. Dep't Health, *Covid-19 Vaccine Breakthrough Weekly Update* (last updated August 16, 2021).[20]  Of those breakthrough cases, 584 people were hospitalized and 60 died.  *Id.*  While these numbers are slim and Dr. Abdelghany's language is cautious, the court continues its practice of "err[ing] on the side of caution to avoid potentially lethal consequences." *Summerfield,* 2021 WL 1517923, at *4.  The court cannot ignore Dr. Abdelghany's unambiguous and uncontradicted opinion that Mr. Mathews faces an increased personal risk of infection by a variant.

      Mr. Mathews has thus demonstrated that he is at risk of infection by a variant.  To prevail, he must also establish a personal risk of serious illness.  In Dr. Abdelghany's opinion, Mr. Mathews' "risk factors [race, gender, substance use disorders, and obesity] place him at highest risk of the life-threatening end of the spectrum of COVID-19 reinfection severity."  Abdelghany Decl. at 9.  Dr. Abdelghany explains that on average, men are 30 percent more likely to be admitted to an intensive care unit, and Black populations are 1.5 to 3 times more likely to be hospitalized when compared to their white counterparts.  *Id.* at 2 (Eboni G. Price-Haywood, et al., *Hospitalization and Mortality among Black Patients and White Patients with Covid-19*, 382 N. Engl. J. Med. 2534 (June 2020)).[21]

      Dr. Abdelghany's assessment of BMI-related risks aligns with that of many district courts, including this court.  *See, e.g.*, *Terraciano*, 492 F. Supp. 3d at 1086 (finding that a body mass index "at or near the level described as 'obese'" can increase a person's risk of hospitalization and death); *United States v. Richardson*, No. 17-00048, 2020 WL 3402410, at *3 (E.D. Cal. June 19, 2020) (finding "obesity alone" places a defendant "at higher risk of COVID-19 complications").  According to the CDC, "[t]he risk of severe COVID-19 illness increases sharply with elevated BMI," and being overweight can make severe illness from COVID-19 more likely.

/////

/////

---

[20] https://www.health.state.mn.us/diseases/coronavirus/stats/vbt.html
[21] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7269015/

11

U.S. Ctrs. for Disease Control & Prevention, *People with Certain Medical Conditions* (May 13, 2021).[22] Mr. Mathews' BMI puts him at increased risk of severe disease.

Courts have not taken a defendant's race, gender, and substance use disorders into account as commonly. Here, however, it is appropriate to consider those factors given Dr. Abdelghany's expert opinion. One study of 12,000 COVID-19 patients cited in his declaration concluded that patients who, like Mr. Mathews, are African American and have been diagnosed with substance use disorders, are more likely to be hospitalized and suffer a fatal infection:

> [T]hose with substance use disorders were almost 50% more likely to die from their illness and about 30% more likely to be hospitalized compared to those who do not use substances. Moreover, in the same study, African Americans with substance use disorder and COVID-19 were about 50% more likely to die from COVID-19 and almost 60% more likely to be hospitalized compared to Caucasian subjects with substance use disorder.

*Id.* at 4 (citing Quan Qiu Wang, et al., *COVID-19 Risk and Outcomes in Patients with Substance Use Disorders: Analyses from Electronic Health Records in the United States*, 26 Mol Psychiatry 30 (2021)).[23] The government correctly notes race is not recognized by the CDC as a "high risk" factor for serious illness resulting from COVID-19, Opp'n at 3 (citing to CDC website that is no longer in operation), but the CDC does recognize "some racial and ethnic minority groups are disproportionately affected by COVID-19," U.S. Ctrs. for Disease Control & Prevention, *Introduction to COVID-19 Racial and Ethnic Health Disparities* (Dec. 10, 2020).[24] Dr. Abdelghany's declaration only strengthens this conclusion, and he has reviewed Mr. Mathews' case in particular. Abdelghany Decl. at 2 (citing Katherine Mackey, et al., *Racial and Ethnic Disparities in COVID-19-Related Infections, Hospitalizations, and Deaths*: *A Systematic Review*, 174 Ann. Intern. Med. 362 (2021)).[25]

---

[22] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html
[23] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7488216/
[24] https://www.cdc.gov/coronavirus/2019-ncov/community/health-equity/racial-ethnic-disparities/index.html
[25] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7772883/

12

The government focuses on Mr. Mathews' previous recovery from COVID-19. Opp'n at 10–11. The government also argues Mr. Mathews' health conditions are "well controlled by the treatment he is receiving from Sandstone FCI," and it contends he remains at low risk of reinfection. Opp'n at 8. It cites no reliable evidence to support this contention, instead relying on a now-aging report in *The New York Times* and a list of district court decisions in which compassionate release was denied to re-infected defendants. These authorities do not outweigh the specific evidence Mr. Mathews has cited.

This court has recognized that a defendant's previous recovery from COVID-19 does not bar a finding of extraordinary and compelling reasons. *See, e.g., Summerfield,* 2021 WL 1517923, at *5. This is especially true when a facility's history does not demonstrate that it has been able to meaningfully control the virus. *Id.* Here, BOP data reflects that 617 people incarcerated at FCI Sandstone have contracted the virus and recovered and one inmate has died. BOP, *Covid-19 Cases, supra.* The BOP website does not make clear whether the 617 people who contracted the virus is a historical number, or if currently 617 of the 814 people incarcerated at the prison at one point were ill. The same is true for the vaccination information provided. *Covid-19 Vaccine Implementation, supra* (citing 617 vaccines "administered" to inmates). The government does concede that FCI Sandstone "previously experienced a significant coronavirus outbreak." Opp'n at 4–5.

This court is among those that have found a large number of individuals having contracted the virus a worrying sign of the condition of the prison. *See, e.g., Summerfield,* 2021 WL 1517923, at *5 (369 incarcerated people contracting the virus at FMC Rochester, potentially representing half of the prison population, "demonstrate[s] to this court the facility has not been able to meaningfully control the spread of the virus"); *United States v. Atkinson*, No. 19-55, 2020 WL 1904585, at *2 (D. Nev. Apr. 17, 2020) (granting compassionate release after reviewing the number across BOP prisons as a whole); *see also United States v. Wilson*, No. 13-2011, 2020 WL 5894193, at *4 (N.D. Iowa Oct. 5, 2020) (granting compassionate release to defendant incarcerated at FCI Sandstone when 76 inmates were currently testing positive and 36 had already recovered). Mr. Matthews' unrebutted declaration strengthens this conclusion. He reports that

13

the prison is "overpopulated" and he sleeps "2 persons per cube" in a "dormitory like setting." *Id.* ¶ 9. He also states that his COVID-19 symptoms persisted for many months, and some are still present. *Id.* ¶ 3. Additionally, while no incarcerated people are currently infected and only one staff member has tested positive, more than half of the population has at one time contracted the virus. *See* BOP, *Covid-19 Cases, supra*.

Mr. Mathews has thus shown he remains at heightened risk of serious illness from a COVID-19 variant even when vaccinated. For that risk to be an extraordinary and compelling reason for release, he must also demonstrate that he cannot avoid infection. Mr. Mathews has narrowly demonstrated that conditions at FCI Sandstone do not permit Mr. Mathews to fend off this high risk. In conclusion, Mr. Mathews' high risk of serious COVID-19 is an extraordinary and compelling reason for release under § 3582(c)(1)(A)(i).

### B. Sentencing Factors

To grant a motion for compassionate release, the court must also consider the relevant factors in 18 U.S.C. § 3553(a). Here, these factors weigh in favor of release, and Mr. Mathews' release plan strengthens this conclusion.

First, the court reflects on the "nature and circumstances of the offense." *See* 18 U.S.C. § 3553(a)(1). Mr. Mathews' crimes were serious, but they were non-violent.[26] Mr. Mathews was part of a drug distribution conspiracy and he was not the leader. Def. Obj. to Presentence Report, ECF No. 76; *see* Sentencing Mins. (May 27, 2016), ECF No. 83.

Second, the court considers the length of Mr. Mathews' sentence in assessing the appropriateness of release, though this factor is not dispositive. Mr. Mathews has completed over fifty percent of his sentence. This court and others have granted compassionate release to defendants serving significantly less time overall, if the other relevant factors weigh in the defendant's favor. *Terraciano*, 492 F. Supp. 3d at 1086 (collecting cases of courts' granting compassionate release to defendants who served less than 30 percent of sentence imposed).

/////

---

[26] The court addresses below the firearms, ammunition, and body armor that agents found in Mr. Mathews' storage unit, truck and home.

Third, the court considers the need to "protect the public from further crimes" and "any pertinent policy statement," including considering any dangers early release might pose to the community. *See* 18 U.S.C. § 3553(a)(2)(C), (a)(5); *United States v. Aruda,* 993 F.3d at 802. Here, the government rightly points to Mr. Mathews' escape as evidence of his recidivism risk. Opp'n at 12. The court does not take this offense lightly, but the facts with respect to the pending matter support Mr. Mathews' motion. After being caught, Mr. Mathews took immediate responsibility and pled guilty to the charges. He explains here that he was struggling with his father's death. Matthews Decl. ¶ 7. The sentencing judge appears to have given weight to his immediate acceptance of responsibility and encouraged the Bureau of Prisons to permit him to continue his plumbing apprenticeship. Sentencing Hearing at 17:10-23. The escape was also a one-time, non-violent offense. *See id.* Mr. Mathews had previously transferred to the Yankton prison camp on a public bus without incident on a 72-hour furlough. Matthews Decl. ¶ 5.

The government highlights another incident in 2018, also at Yankton, where Mr. Mathews admitted to possessing a contraband cellphone. Opp'n Ex. 3 at 1. Without excusing the incident, the action does not demonstrate he has a violent nature, has acted violently in prison, or would be violent if released. It does not show his motion should be denied. *See United States v. Tamasoa*, No. 15-0124, 2020 WL 6700415, at *5 (E.D. Cal. Nov. 13, 2020) (infraction for use of a cellphone not violent).

Fourth, in its discretion, the court assesses Mr. Mathews' potential for danger to the community. The government argues Mr. Mathews' possession of 36 firearms, thousands of rounds of ammunition, and body armor at the time of his arrest underlying the offense here demonstrates that he holds "no respect for the law and would continue to pose a danger to the public." Opp'n at 12. The sentencing judge took into account the fact that Mathews was found in possession of the firearms at the time of the arrest. *See* Presentencing Report at 9, ECF No. 72. The government ultimately dismissed all firearms charges and the firearms were not connected to any part of the offense at the time of arrest. Def. Sentencing Memorandum, ECF No. 80. Numerous courts, including this one, have recognized that the presence of firearms does not in and of itself make a crime violent, especially when there is no evidence connecting the gun to the

15

specific conviction offense. *See, e.g., United States v. Bryant*, 500 F. Supp. 3d 1172, 1175 (E.D. Wash. 2020) (defendant convicted of felon in possession of a firearm not a danger to the community when the firearm not used violently); *United States v. Rodriguez*, 451 F. Supp. 3d 392, 406 (E.D. Pa. 2020) (defendant with extensive criminal history of low-level drug offenses and fire arm offenses was not a danger to the community as no evidence in the record suggested use of the firearm in the drug transactions). His prior criminal history, which involves low-level drug offenses and a felon in possession of a firearm conviction, also do not indicate danger to the community. *See* Presentencing Report at 11.

Lastly, Mr. Mathews' three-year term of supervised release and release plan weigh in his favor. He will be eligible to apply for medical insurance through *Sacramento Covered*. Release Plan at 2, ECF No. 192 (sealed). Mr. Mathews' uncle is a construction contractor and will work to help him find a job in one of the trades he learned in prison. *Id.* The defense also points to two mentoring programs, which the social work team of the Federal Defender's Office can help Mr. Mathews apply for. *Id.* at 3–4. The Probation Office has also reviewed Mr. Mathews' release plan and confirmed the proposed residence is acceptable, taking account of current circumstances in which Mr. Mathews' wife is living with her brother.

### IV. CONCLUSION

Mr. Mathews' medical conditions and residence at FCI Sandstone place him at high risk of infection with a COVID-19 variant, and are extraordinary and compelling reasons for compassionate release. The sentencing factors weigh in favor of release. The court therefore reduces Mr. Mathews' sentence to time served.

All previously imposed conditions of supervised release remain in effect.

There being a verified residence and an appropriate release plan in place, this order is stayed for up to seven days for Mr. Mathews to make appropriate travel arrangements and for BOP to ensure the defendant's safe release. The defendant shall be released as soon as appropriate travel arrangements are made and it is safe for the defendant to travel. There shall be no delay in ensuring travel arrangements are made. If more than seven days are needed to make appropriate

/////

16

travel arrangements and ensure the defendant's safe release, then the parties shall immediately notify the court and show cause why the stay should be extended.

The court orders Mr. Mathews to self-isolate for fourteen days in his wife's brother's residence upon his arrival there, as a means of protecting his health and that of the others residing in the home. He must also comply with all applicable public health orders.

This order resolves ECF No. 172.

IT IS SO ORDERED.

DATED: August 30, 2021.

_____
CHIEF UNITED STATES DISTRICT JUDGE